# No. 24-5532

# In the
# United States Court of Appeals
# for the Sixth Circuit

COMMONWEALTH OF KENTUCKY; STATE OF SOUTH DAKOTA;
STATE OF ALABAMA; STATE OF ALASKA; STATE OF FLORIDA;
STATE OF IDAHO; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS;
STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF NEBRASKA;
STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA;
STATE OF UTAH; STATE OF SOUTH CAROLINA; COMMONWEALTH OF VIRGINIA;
STATE OF WEST VIRGINIA; STATE OF WYOMING; STATE OF ARKANSAS,

*Plaintiffs-Appellants,*

v.

FEDERAL HIGHWAY ADMINISTRATION; SHAILEN BHATT, in his official capacity at
Administrator of the Federal Highway Administration; UNITED STATES DEPARTMENT
OF TRANSPORTATION; PETER PAUL MONTGOMERY BUTTIGIEG,
in his official capacity as Secretary of Transportation; JOSEPH R. BIDEN,
in his official capacity as President of the United States,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Paducah, No. 5:23-cv-00162.
The Honorable Benjamin J. Beaton, Judge Presiding.

## BRIEF OF *AMICI CURIAE* U.S. SENATORS KEVIN CRAMER AND SHELLEY MOORE CAPITO, U.S. REPRESENTATIVES SAM GRAVES AND ERIC A. "RICK" CRAWFORD, AND ADDITIONAL U.S. SENATORS IN SUPPORT OF THE STATE APPELLEES

JONATHAN R. ELLIS
DALLAS F. KRATZER III
J. ZACHARY BALASKO
MATTIE F. SHULER
STEPTOE & JOHNSON PLLC
707 East Virginia Street, 17th Floor
Charleston, WV 25301
(304) 353-8118

*Attorneys for Amici Curiae*



In addition to
U.S. Senators Kevin Cramer (N.D.) and Shelley Moore Capito (W. Va.) *and* U.S. Representatives
Sam Graves (Mo.-6) and Eric A. "Rick" Crawford (Ark.-1),
the following U.S. Senators are participating
as amici curiae are:

Sen. Mitch McConnell, U.S. Senate Republican Leader (Ky.)
Sen. John Barrasso (Wyo.)
Sen. John Boozman (Ark.)
Sen. Mike Braun (Ind.)
Sen. Katie Boyd Britt (Ala.)
Sen. Mike Crapo (Idaho)
Sen. Ted Cruz (Tex.)
Sen. Steve Daines (Mont.)
Sen. Joni K. Ernst (Iowa)
Sen. Deb Fischer (Neb.)
Sen. Lindsey O. Graham (S.C.)
Sen. John Hoeven (N.D.)
Sen. Cindy Hyde-Smith (Miss.)
Sen. Cynthia M. Lummis (Wyo.)
Sen. Roger Marshall, M.D. (Kan.)
Sen. Markwayne Mullin (Okla.)
Sen. Pete Ricketts (Neb.)
Sen. James E. Risch (Idaho)
Sen. Mike Rounds (S.D.)
Sen. Marco Rubio (Fla.)
Sen. Rick Scott (Fla.)
Sen. Tim Scott (S.C.)
Sen. Dan Sullivan (Alaska)
Sen. John Thune (S.D.)
Sen. Tommy Tuberville (Ala.)
Sen. Roger F. Wicker (Miss.)

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5532          Case Name: Kentucky v. Federal Highway Admin.

Name of counsel: Jonathan Ellis

Pursuant to 6th Cir. R. 26.1, U.S. Senators Kevin Cramer and Shelley Moore Capito et al.

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

## CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

*AMICI* STATEMENT ................................................................. 1

ARGUMENT ................................................................................ 2

    1.    The Framers divided power among branches to ensure fundamental policy decisions result from compromise ................................................................. 3

    2.    Congress did not previously give Highways the authority to issue a GHG performance measure regulation ................................................................. 6

    3.    Congress, led by the Senate, crafted the final version of the Infrastructure Act through bipartisan negotiations and compromise that continued to withhold the authority to issue a GHG performance measure regulation ................................................. 10

    4.    Highways misconstrues Congress's intent regarding resiliency and carbon reduction provisions and then relies on that misconstruction to justify its improper exercise of authority ............................................... 14

    5.    Highways bypassed principles of federalism to further its own policy agenda by issuing a GHG regulation ................................................................. 16

    6.    The Judicial Branch must now reaffirm the separation of power and undo the overreaching issuance of a GHG regulation ................................. 22

CONCLUSION ............................................................................. 28

CERTIFICATE OF COMPLIANCE .................................................... 29

CERTIFICATE OF SERVICE ............................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AFL-CIO v. Am. Petroleum Inst.,*
    448 U.S. 607 (1980) ..................................................4-5

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ........................................ 18, 22

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ...................................... 16, 18, 19

*Department of Transportation v. Association of American Railroads,*
    575 U.S. 43 (2015) ...................................................17

*Fletcher v. Peck,*
    10 U.S. 87 (1810) ....................................................17

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ...............................................18

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................19

*King v. Burwell,*
    576 U.S. 473 (2015) ...............................................18

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) ..............................5, 22, 26, 27

*Marbury v. Madison,*
    5 U.S. 137 (1803) ................................................3, 26

*Myers v. United States,*
    272 U.S. 52 (1926) ...............................................3, 4

*Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers,*
    531 U.S. 159 (2001) ................................................21

*W. Virginia v. Envtl. Protec. Agency,*
    597 U.S. 697 (2022) ......................................... *passim*

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ............................................ 4

*Whitman v. Am. Trucking Assns.*,
   531 U.S. 457 (2001) ........................................ 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1852) ...................................3-4, 20

**Statutes & Other Authorities:**

U.S. Const. art. I, § 1 .......................................... 3

23 U.S.C. § 119(b) ............................................. 15

23 U.S.C. § 119(b)(4) .......................................... 14

23 U.S.C. § 119(d)(1)(A) ........................................ 9

23 U.S.C. § 119(d)(2)(R) .................................... 14, 15

23 U.S.C. § 149 ................................................. 7

23 U.S.C. § 150 ........................................ 6, 7, 8, 9, 10

23 U.S.C. § 150(c) ...................................... *passim*

23 U.S.C. § 150(c)(2)(C) ........................................ 7

23 U.S.C. § 150(c)(3)(5) ....................................... 16

23 U.S.C. § 150(c)(3)(A)(iv)-(v) ................................ 8

23 U.S.C. § 150(c)(4) .......................................... 9

23 U.S.C. § 150(c)(5)(B) ....................................... 9

23 U.S.C. § 150(c)(6) .......................................... 9

23 U.S.C. § 175 ............................................... 15

23 U.S.C. § 176 ............................................... 15

49 U.S.C. § 149(b) ............................................ 10

88 Fed. Reg. 85364 (Dec. 7, 2023) ............................. 16

Clean Air Act § 111(d) ..................................... 23, 24

Fed. R. App. P. 29(a)(2) ....................................... 1

Fed. R. App. P. 29(a)(4) ................................................................1

H.J. Res. 114 ..............................................................................22

H.R. 3684 ..........................................................................12, 13

H.R. Rep. No. 117-70 .................................................................12

P.L. 112-141 ................................................................................6

S. 1953 ...............................................................................11, 13

S. Breyer, *Making Our Democracy Work: A Judge's View* 110 (2010) ......................................................................................20

S.J. Res. 61 ................................................................................22

Sen. Cramer, *Senator Cramer and Congressman Crawford Lead Resolution to Overturn FWHA's Illegal, Impractical GHG Emissions Performance Measure Rule* (Feb. 7, 2024) ................27

*Sen. Cramer: United States Needs Rural America, and Rural America Needs Infrastructure* ......................................................2

The Federalist No. 10 (J. Madison) ..............................................4

The Federalist No. 47 (J. Madison) ............................................20

The Federalist No. 51 (J. Madison) ..............................................4

The Federalist No. 62 (J. Madison) ............................................20

The Federalist No. 70 (A. Hamilton) .....................................4, 21

Trans. Dep'ts of Idaho *et al.*, Letter on Proposed Rule re: National Performance Management Measures and Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure 2 (October 9, 2022) ......................................7

U.S. Congress, H.R. 3684 ...................................................12, 13

U.S. House Rep., Roll Call 208 (Bill No. H.R. 3684) ...................12

U.S. Senate, Roll Call Vote 117th Cong. (1st Session) ...............13

# AMICI STATEMENT

In general, as elected members of Congress, Amici have strong institutional interests in protecting Congress's exclusive authority to enact legislation and delegate authority under statute. Many amici also sit on the committees with jurisdiction over the Federal Highway Administration (Highways), specifically the U.S. Senate Committee on Environment and Public Works and the U.S. House of Representatives Committee on Transportation and Infrastructure. Thus, Amici also have an interest in the faithful implementation of agency authorizing statutes, including the Infrastructure Investment and Jobs Act (Infrastructure Act), and respect for the compromises made to bring them to fruition.

Amici are filing this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). They further state that no party's counsel authored this brief in whole or in part, that no party or its counsel contributed money intended to fund this brief, and that no one other than Amici contributed money intended to fund this brief. *See* Fed. R. App. P. 29(a)(4).

## ARGUMENT

Fundamentally, a bill becomes a law by passing through the House and the Senate in the same form and receiving the President's signature. In practice, a bill becomes a law through this process only if members of the House and Senate "collaborate and find common ground." *Sen. Cramer: 'United States Needs Rural America, and Rural America Needs Infrastructure, available at* https://bit.ly/4dZ3iwG (last visited Aug. 4, 2021). As a result of this process, some provisions are codified in statute as law, while others are not, due to political give and take. Once a final compromise is codified in statute, the Executive Branch cannot unilaterally supersede the legislative process to revive proposed provisions Congress did not pass. Yet that is exactly what happened when Highways proposed and finalized their greenhouse gas (GHG) performance measurement regulation.

Legislative negotiations produced the Infrastructure Act, which did not include the GHG performance measure provision contemplated during those negotiations. The President then signed

the Infrastructure Act into law, without authorization for a GHG performance measure. Highways then unilaterally contorted existing statutory authority to issue the GHG performance measure provisions previously rejected through agency rulemaking. This cannot stand.

1. **The Framers divided power among branches to ensure fundamental policy decisions result from compromise.**

The Framers created a system of checks and balances to create "a government of laws and not of men." *Myers v. United States*, 272 U.S. 52, 84 (1926). To the Executive, they gave the power to recommend laws it thinks wise and to veto those it thinks unwise. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1852). To the Legislature, they gave "all legislative powers." U.S. Const. art. I, § 1 (cleaned up). And to the Judiciary was entrusted "the province and duty to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (cleaned up).

For the Framers, the virtue of separating powers was "not a mere theory"—it was "a felt necessity" to neutralize the danger of

"concentrated power." *Youngstown*, 343 U.S. at 593–94 (1952) (Frankfurter, J., concurring). The Framers understood this restrictive structure would not be efficient and could cause friction, but for them, the price "was deemed not too high in view of the safeguards which these restrictions afford." *Id.* at 613–14; *see also Myers*, 272 U.S. at 85 (noting separation of powers does not exist to "promote efficiency" or "avoid friction").

The Framers did not stop there. They also insisted Congress have two bodies—the Senate and the House—and those bodies must together produce legislation through a process of negotiation and compromise. The Federalist No. 51, at 345 (J. Madison); *see also Wesberry v. Sanders*, 376 U.S. 1, 9–14 (1964) (recounting the Great Compromise). The Framers envisioned "differences of opinions" and "the jarrings of parties" would "promote deliberation and circumspection." The Federalist No. 70, at 475 (A. Hamilton). This bargaining process guarantees new legislation is the product of diverse perspectives and enjoys wide social acceptance. *See* The Federalist No. 10, at 82–84 (J. Madison). The need for compromise

inherent in this design protects fundamental policy decisions from disarray and guarantees "the buck stops with Congress." *AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring).

With the rise of the Administrative State in the 1930s and 1940s, Congress went further to limit administrative authority to protect its Article I sole authority to legislate and scope the use of delegated authority by agencies. "Congress in 1946 enacted the [Administrative Procedure Act (APA)] as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (cleaned up). Through the APA, Congress not only set a transparent process for agencies to promulgate regulations with the effect of law, but also included explicit judicial review provisions to ensure the courts could check agencies exceeding their statutory authority.

Thus, Congress and the courts have carried on the Framers' separation of power principles ratified in the Constitution to this

day, ensuring administrative agencies wielding delegated power to promulgate regulations with the force and effect of law stay within the delegated authority granted by Congress. In this case, Highways exceeded the limited authority granted to it by promulgating a regulation based on ancillary authority to implement the exact regimen Congress considered in drafting and negotiating the Infrastructure Act, but ultimately declined to codify in statute or delegate to the agency.

2. **Congress did not previously give Highways the authority to issue a GHG performance measure regulation.**

On July 6, 2012, the Moving Ahead for Progress in the 21st Century Act (P.L. 112-141) became law, establishing national goals and performance measures for the Federal-aid highway program. *See* 23 U.S.C. § 150. Section 150's subsection (a) establishes the policy that the statute seeks to implement, while subsection (b) describes the goals of that policy. The introductory declaration of policy and list of national goals provide context for the congressional delegation, but it is subsection (c) that prescribes the limited

rulemaking authority of the Secretary of Transportation—delegated to Highways—to issue only those performance measures described in subsection (c). 23 U.S.C § 150(c)(2)(C) ("In carrying out paragraph (1) the Secretary shall … limit performance measures only to those described in this subsection."). As noted by the state departments of transportation of Idaho, Montana, North Dakota, South Dakota, and Wyoming, in joint comments on the proposed rule, "there is no express mention of a GHG or $CO_2$ performance measure in 23 U.S.C § 150(c). Nor is there other language in the subsection that describes a GHG measure." Trans. Dep'ts of Idaho et al., Letter on Proposed Rule re National Performance Management Measures and Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure 2 (October 9, 2022), *available at* https://bit.ly/3XCvPTE.

Congress did not grant authority in subsection (c) of § 150 to issue a GHG performance measure. Instead, the subsection authorizes performance measures related to three programs receiving Federal-aid highway formula funding: the National

Highway Performance Program, the Highway Safety Improvement Program, and the Congestion Mitigation and Air Quality Program, as well as measures related to freight movement on the Interstate System. By limiting the scope of the performance measures to only those described in § 150, Congress also ensured federal funding was available for states to help meet the targets set in response to the performance measures.

In paragraph (3) of subsection (c), Congress authorized performance measures under the National Highway Performance Program. The first three measures deal with the condition of pavement and bridges and so would not support a GHG performance measure. The last two authorized measures in paragraph (3) deal generally with "the performance of" the Interstate System and the National Highway System. 23 U.S.C. § 150(c)(3)(A)(iv)–(v). However, the list of eligible projects under the National Highway Performance Plan statute lists only those projects supporting "progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction,

system reliability, or freight movement on the National Highway System," with no other mention of the goal of "environmental sustainability," "greenhouse gas," "carbon dioxide (CO2)," or "emissions." 23 U.S.C. § 119(d)(1)(A).

The authorized performance measures identified in § 150(c)(4) for the Highway Safety Improvement Program are "serious injuries and fatalities per vehicle mile traveled" and "the number of serious injuries and fatalities." Neither this language, nor the authorization in § 150(c)(6) for performance measures related to freight movement on the Interstate System provide express or implied authority for a GHG performance measure.

The term "emissions" appears only once among the authorized performance measures in § 150. Section 150(c)(5)(B), authorizes the Secretary to establish performance measures addressing on-road mobile source emissions "for the purpose of carrying out Section 149." In § 149, Congress authorizes the Congestion Mitigation and Air Quality Program. *See* 23 U.S.C. § 149. This program is tightly integrated with the Clean Air Act and specifically requires eligible

projects to focus on "ozone, carbon monoxide, or particulate matter", but not carbon dioxide. 49 U.S.C. § 149(b). Thus, the only authority within § 150 for a performance measure addressing on-road mobile source emissions is limited to a list of pollutants that excludes greenhouse gases.

The lack of express or implied authority for Highways to impose a GHG performance measure—coupled with the clear intent of Congress to limit the agency's authority to issue performance measures for only those items listed in § 150(c)—compels one conclusion. That is, Highways lacks the authority under § 150 to issue a GHG performance measure regulation. And this lack of authority for Highways to issue a GHG performance measure is, of course, the reason why some members of Congress sought to include this authority for the agency in the Infrastructure Act, which was eventually rejected through the legislative compromise to pass that law.

3.   **Congress, led by the Senate, crafted the final version of the Infrastructure Act through bipartisan negotiations and compromise that continued to withhold the authority to issue a GHG performance measure regulation.**

The Infrastructure Act was largely the product of a Senate compromise, modifying some original provisions and excluding others. One compromise was the rejection of a provision, which would have authorized Highways to establish a GHG performance measure regulation nearly identical to the regulation at issue.

The highway title of the Infrastructure Act began as S. 1953. The Senate Environment and Public Works Committee's initial draft contained a bipartisan provision establishing a GHG performance measure with an exception for many rural states. However, when some Committee members decided a rural exemption to this provision was too broad, the Committee struck a compromise to remove the GHG performance measure provision in its entirety, thus securing unanimous passage of the bill through Committee.

Meanwhile, the House debated its own version of the bill, H.R. 3684. While the Senate engaged in bipartisan negotiations, the House dealt in partisan politics. In fact, Republicans on the House Transportation and Infrastructure Committee were shut out of the legislative process: "Democrats again excluded Republicans from the process" and "the 32 Republicans on the Committee stood ready to work in partnership to bolster the transportation sector in these unprecedented times; unfortunately, this was not the path the Majority chose." H.R. Rep. No. 117-70, at 1487 (2021), *available at* https://bit.ly/3XOS3Rl (cleaned up).

Like the early draft of the Senate bill, the House bill included a GHG performance measure provision, but it did not feature a rural exemption. The House narrowly passed the bill on partisan lines with only two Republicans voting for passage. *See* U.S. House Rep., Roll Call 208 (Bill No. H.R. 3684), https://bit.ly/4ekGCqS (last visited Aug. 8, 2024).

After passing the House, H.R. 3684 went to the Senate for consideration. The Senate amended the bill to include the text of

S.1953, thus removing and rejecting the House's GHG performance measure provision. The Senate then passed the bill by a bipartisan 69-to-30 vote. *See* U.S. Senate, Roll Call Vote 117th Cong. (1st Session), *available at* https://bit.ly/3WzK9KZ (last visited Aug. 8, 2024). The House concurred in the Senate amendment, and the Infrastructure Act—without the GHG performance measure provision by a vote of 228-205 (roll no. 369). The bill was signed into law by the President in November 2021. *See* U.S. Congress, H.R. 3684 (Infrastructure Investment and Jobs Act), https://bit.ly/3WGC7Qm (last visited Aug. 8, 2024).

As described by the Chairman and Ranking Member of the Senate Environment and Public Works Committee, who managed floor debate and final passage of the bill, the Infrastructure Act's passage "cut across partisan divides" and was the "the culmination of a process that began months ago…" (statements of Chairman Tom Carper (D–Del.) and Ranking Member Shelley Moore Capito (R–W.Va.)). The President—head of the Executive Branch—signed the Infrastructure Act into law with full knowledge the final bill

excluded the exact authority Highways now seeks to exercise and have this Court uphold.

**4. Highways misconstrues Congress's intent regarding resiliency and carbon reduction provisions and then relies on that misconstruction to justify its improper exercise of authority.**

The Infrastructure Act included several provisions aimed at increasing resiliency and reducing carbon emissions. While Congress acted in a bipartisan way to provide resources to states to address these issues, Highways has misconstrued the effect of these provisions to mask the lack of statutory support for a GHG performance measure regulation.

Highways seeks to justify the GHG performance measure regulation by citing the purposes of the National Highway Performance Program (Program), which include providing resources to protect the resilience of the National Highway System against extreme weather events and other natural disasters. 23 U.S.C. § 119(b)(4). Congress added this language to the Program's purposes in the Infrastructure Act, recognizing states may, pursuant to § 119(d)(2)(R), use the Program's resources on projects to improve

resiliency. The Program's purposes in § 119(b) do not expand the list of performance measures authorized in § 150(c). Instead, § 119(b) provides a general statement of congressional objectives for the Program.

The Infrastructure Act expanded resources provided to states to enhance the resiliency of roads and bridges against extreme weather events and to reduce carbon emissions. These expanded resources were provided through new eligibilities within existing programs and through the addition of new formula programs. *See* 23 U.S.C. §§ 119(d)(2)(R), 175, 176. This additional funding to help improve resiliency and reduce carbon emissions was not accompanied by new authority to issue related performance measures. No additional authority to issue performance measures was added to § 150(c) to support the new carbon reduction program established by the Infrastructure Act as § 175 or the new resiliency program established as § 176.

Congress understands how to authorize performance measures to accompany highway formula programs when it chooses

to do so. In § 150(c)(3)(5), Congress specifically linked authority to issue performance measures with specific formula programs.

In the Infrastructure Act, Congress chose to expand the existing programs and create new programs to provide financial resources to improve resiliency and address carbon emissions without providing associated new authority to issue performance measures.

Because Congress chose to act in a bipartisan way to address resilience and carbon emissions without adding new authority to create a GHG performance measure under § 150(c), Highways' reliance on the Infrastructure Act's climate related provisions as a source of authority for this rule misapplies congressional intent.

**5.  Highways bypassed principles of federalism to further its own policy agenda by issuing a GHG regulation.**

Congress considered, and ultimately rejected, providing Highways with the authority to issue a GHG performance measure regulation, but Highways contorted ancillary existing authorities to impose one anyway. *See* 88 Fed. Reg. 85364 (Dec. 7, 2023). In doing

so, Highways impermissibly usurped the Legislative Branch's authority and promulgated the GHG performance measure without statutory authority delegated by Congress.

The legislative process is predicated on a system of checks and balances, both inside Congress and with coequal branches of government, and Highways seeks to "dash this whole scheme." *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring). It is "natural" those in the Executive Branch would seek to take matters into their own hands. *W. Virginia v. Envtl. Protec. Agency*, 597 U.S. 697, 752–53 (2022) (Gorsuch, J., concurring). But the Constitution does not authorize agencies to use "pen-and-phone regulations as substitutes for laws passed by the people's representatives." *Id*. Instead, "it is the peculiar province of the legislature to prescribe general rules for the government of society." *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) (cleaned up).

Federal agencies may regulate, but only to the extent Congress grants them statutory authority to do so. Congress, through its

legislative power, can grant an agency a broad license or a restricted license to regulate. Importantly, the broader the license claimed, the clearer Congress must be, as Congress does not confer atypical authority "without saying more." *Biden v. Nebraska*, 143 S. Ct. 2355, 2382–83 (2023) (Barrett, J., concurring).

For instance, in *Gonzales v. Oregon*, the Supreme Court explained "an implicit delegation" of authority from Congress did not permit the Attorney General to make a rule restricting the use of controlled substances in physician-assisted suicide. 546 U.S. 243 (2006). Then, in *King v. Burwell*, the Supreme Court demanded an express delegation of authority for the Internal Revenue Service to decide whether the Affordable Care Act's tax credits could be available on federally established exchanges. 576 U.S. 473, 486 (2015) ("Had Congress wished to assign that question to an agency, it surely would have done so expressly." (cleaned up)). And in *National Federation of Independent Business v. OSHA*, the Supreme Court observed that Congress empowered OSHA "to set workplace safety standards" and to ensure "safe and healthful working

conditions," but that did not include the power to mandate the vaccination of employees. *Id*. at 117-18.

The Supreme Court has also recognized the role the Legislative Branch's process plays when it comes to determining the authority conferred. Legislation is "a step-by-step, deliberate and deliberative process." *INS v. Chadha*, 462 U.S. 919, 959 (1983) (cleaned up). And the "basic and consequential tradeoffs" inherent in a bringing legislation to fruition "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U.S. at 730. When a sweeping environmental program is at issue—as here—an agency must "point to clear congressional authorization" to justify its regulations. *Id*. at 700. For it is "highly unlikely that Congress" would authorize a program like that through a "subtle device." *Nebraska*, 143 S. Ct. at 2369–70.

Here, Congress was not simply ambiguous about the power to create a GHG performance measure regulation, but it considered and then rejected the idea Highways now seeks to implement. It is one thing to infer congressional authorization when Congress has

not addressed a specific situation. It is an entirely different thing, altogether, to infer authorization when Congress specifically considered and debated a problem, and then affirmatively rejected granting that specific authority. *See e.g.*, *Sawyer*, 343 U.S. at 609 (Frankfurter, J., concurring). The latter "is not merely to disregard the clear will of Congress." *Id.* (cleaned up). It subverts the Legislature and the Framer's intentional "constitutional division of authority." *Id.*

Additionally, handing legislative authority over to the Executive Branch causes problems, as legislation through regulation would "become nothing more than the will of the current President, or, worse yet, the will of unelected officials" since "the president may not have the time or willingness to review agency decisions." S. Breyer, *Making Our Democracy Work: A Judge's View* 110 (2010) (cleaned up). Agencies could thus create new laws at will. Executive intrusion would no longer be difficult and rare, but easy and profuse. *See* The Federalist No. 47, at 303 (J. Madison); *id.*, No. 62, at 378 (J. Madison). And with any number of laws subject to

change from one administration to another, there would be no legal stability. Nor will legislative acts be the product of cross-party consensus, undermining foundational principles. The Federalist No. 70, at 475 (A. Hamilton). Little would remain to stop agencies from moving into areas where Congress' lawmaking authority has traditionally predominated. *See, e.g., Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159, 173–74 (2001).

Put simply, when Highways established a GHG performance measure regulation, it exceeded the powers Congress authorized. And it did so both at the expense of separation of powers and in violation of the APA. Highways' lack of authority to issue a GHG performance measure rule, in both the relevant section of Title 23 and the Infrastructure Act, led to numerous admonitions from members of Congress, culminating in joint resolutions of disapproval of the rule under the Congressional Review Act being introduced in both the House and the Senate. On the Senate side,

Senators Cramer and Capito led the joint resolution (S.J.Res.61), which passed with bipartisan support on April 10, 2024. And on the House side, Representatives Crawford and Graves led the joint resolution (H.J.Res.114)—a vote remains pending.

### 6. The Judicial Branch must now reaffirm the separation of power and undo the overreaching issuance of a GHG regulation.

When one branch of our government oversteps its authority and enters another's territory, the Judicial Branch can and should intervene. In recent years, the Judicial Branch has been called on time and again to intervene on behalf of the Legislative Branch due to executive overreach.

Three recent cases demonstrate the United States Supreme Court's recent trend toward curtailing executive overreach: *West Virginia v. EPA*, *Biden v. Nebraska*, and *Loper Bright Enterprises v. Raimondo*. Each demonstrates the Court's commitment to the Major Questions doctrine and independent statutory interpretation, finding time and time again that executive agencies cannot impose

regulations that substantially impact the economy, or the rights of states under our system of federalism, without clear authorization from Congress to do so. In other words, Congress does not "hide elephants in mouse holes." *Whitman v. Am. Trucking Assns.*, 531 U.S. 457, 478 (2001).

To start, in *West Virginia*, EPA claimed that through the Clean Air Act, Congress gave it the authority to cap emissions from coal and natural gas fired power plants as part of its Clean Power Plan. 597 U.S. 697, 726–27 (2022). The Court disagreed, concluding that EPA could not use Section 111(d) of the Clean Air Act—which had been used "only a handful of times since the enactment of the statute in 1970"—to impose a sweeping emissions regulation. *Id.* at 710. Employing the "major questions" doctrine, the Court explained that courts reviewing overbroad regulations—like the one at issue— must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (cleaned up). Further, to overcome that presumption, "something

more than a merely plausible textual basis for the agency action is necessary"—like "clear congressional authorization." *Id.* (cleaned up). And EPA failed to overcome the presumption since it had only "located [its] newfound power in the vague language of an ancillary provision of the Act" (i.e., Section 111(d)) that was not intended to accomplish what EPA set out to do. *Id.* at 724 (noting provision "was designed to function as a gap filler and had rarely been used in the preceding decades" and "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself").

The Court again struck down executive overreach in *Nebraska*, deciding that the so-called HEROES Act didn't authorize the Secretary of Education to establish a sweeping student loan forgiveness program. 600 U.S. 477 (2023). In that case, the Secretary of Education pointed to a HEROES Act provision providing him power to waive or modify the requirements of federal student loans—and the COVID-19 pandemic—to justify $430 billion in

student loan forgiveness. That, the Court concluded, went too far. Although the Secretary could "modify" loans, that didn't mean the Secretary could make "basic and fundamental changes in the scheme designed by Congress." 600 U.S. at 494. By forgiving billions of dollars of debt, the Secretary hadn't made incremental or marginal changes; rather, the Secretary "created a novel and fundamentally different loan forgiveness program." *Id.* at 495. The Court further observed that the Secretary "modified the cited provision only in the same sense that the French Revolution modified the status of the French nobility—it had abolished them and supplanted them with a new regime entirely." *Id.* (cleaned up). And in the regulatory context, "the word 'modify' simply cannot bear that load." *Id.* at 498. At bottom, while appreciating pandemic-related burdens on borrowers, the Court stressed that the question "is not whether something should be done; it is who has the authority to do it." *Id.* at 501. And the Executive Branch did not have the sweeping authority to rewrite the federal student loan program, just as it lacks the authority to rewrite the Infrastructure Act.

Just last term, in *Loper Bright*, the Court was again called upon to correct executive overreach. 144 S.Ct. 2244 (2024). *Loper Bright* questioned *Chevron* deference and thus the propriety of shifting interpretative power from the Judicial Branch to the Executive Branch. The Court overruled *Chevron* and thus curtailed executive branch power to expansively interpret its own authority. Citing *Marbury v. Madison*, the Court reiterated that the Judicial Branch has long been responsible for exercising "independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 2273; *see also id.* at 2261. The Court further cautioned that while "courts must respect the delegation" of authority by Congress, they must ensure "that the agency acts within" that authority *and* "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.*

Taken together, *West Virginia*, *Nebraska*, and *Loper Bright* make clear that an agency needs congressional authorization to act. And applied here, these cases also affirm that Highways impermissibly issued a GHG performance measure regulation. Congress debated, considered, and declined to give Highways authority to issue this rule. Plainly put, "the absence of a prohibition is not a license." Sen. Cramer, *Senator Cramer and Congressman Crawford Lead Resolution to Overturn FWHA's Illegal, Impractical GHG Emissions Performance Measure Rule* (Feb. 7, 2024), *available at* bit.ly/4dxoV71. This Court should, therefore, correct course and curtail Highways' overreach.

## CONCLUSION

The Legislative Branch did not authorize the Executive Branch to implement a GHG performance measure regulation, so this Court should affirm the district court's decision confirming the legislative prerogative of Congress.

**U.S. SENATORS**
**KEVIN CRAMER AND**
**SHELLEY MOORE CAPITO,**
**U.S. REPRESENTATIVES**
**SAM GRAVES & ERIC A.**
**"RICK" CRAWFORD,**
**AND ADDITIONAL UNITED**
**STATES SENATORS**

*/s/ Dallas F. Kratzer III*
Jonathan R. Ellis
Dallas F. Kratzer III
J. Zachary Balasko
Mattie F. Shuler
*Steptoe & Johnson PLLC*
707 E. Virginia Street, 17th Floor
Charleston, WV 25301
304.353.8118
jonathan.ellis@steptoe-johnson.com
dallas.kratzer@steptoe-johnson.com
zak.balasko@steptoe-johnson.com
mattie.shuler@steptoe-johnson.com

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 4,417 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated: October 7, 2024

/s/ Dallas F. Kratzer III
Dallas F. Kratzer III

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 7, 2024, an electronic copy of the aforementioned brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

Dated: October 7, 2024

*/s/ Dallas F. Kratzer III*
Dallas F. Kratzer III